[Civil No. 1798.  Filed November 24, 1920.]

[193 Pac. 535.]

R. L. KEITH and B. S. REED, Copartners, Doing Business as KEITH & REED, Appellants, v. AZTEC LAND & CATTLE COMPANY, a Corporation, and GEORGE C. MORSE, Appellees.

1. PRINCIPAL AND AGENT—AGENT HELD, UNDER THE EVIDENCE, TO HAVE NO AUTHORITY TO COMPLETE CONTRACT TO PURCHASE.—In ejectment to recover lands claimed by defendants as purchaser from plaintiff company under executory contract, evidence *held* to show that plaintiff's agent, who carried on the preliminary negotiations, was not authorized to complete the contract without approval of the company.

2. VENDOR AND PURCHASER — CONTRACT TO PURCHASE HELD ESTABLISHED BY RATIFICATION AND GOING INTO POSSESSION.—In ejectment to recover land claimed by defendants as purchaser from plaintiff company under executory contract, evidence *held* to show that draft of contract submitted by plaintiff's agent was ratified by the company by acceptance of the contract with portion of land already sold eliminated and acceptance of first payment, and acceptance by purchaser by taking possession under the contract.

3. FRAUDS, STATUTE OF—PART PAYMENT HELD SHOWN, TAKING CONTRACT FOR SALE OF LAND OUT OF STATUTE.—Evidence *held* to show that a part payment by the purchaser of land was accepted by the vendor so as to take the transaction out of the statute of frauds.

4. FRAUDS, STATUTE OF—EVIDENCE HELD INSUFFICIENT TO SHOW POSSESSION UNDER CLAIMED CONTRACT WAS WRONGFUL.—Relative to part performance under the statute, evidence *held* insufficient to show that purchasers taking possession under claimed contract to purchase was wrongful, where seller made no protest until after it attempted to repudiate the contract.

5. VENDOR AND PURCHASER—RIGHTS OF PURCHASERS HELD PRIOR TO
   UNRECORDED LEASE.—Under Civil Code of 1913, sections 2066–2080,
   a purchaser of grazing lands, taking possession under executory
   contract, has prior rights to lessee under antedated lease, not re-
   corded at time of purchase or of taking possession.

APPEAL from a judgment of the Superior Court
of the County of Navajo. F. H. Lyman, Judge.
Judgment reversed; complaint dismissed.

Mr. W. E. Ferguson and Messrs. Kibbey, Bennett &
Jenckes, for Appellants.

Mr. C. H. Jordan and Mr. J. C. Forest, for Appel-
lees.

ROSS, J.—The plaintiffs, Aztec Land & Cattle Com-
pany, as the owner, and George C. Morse, as lessee
and as purchaser under an executory contract, brought
ejectment to dispossess defendants from sections 1, 3,
11, 27, 33 and 35, township 14 north, range 19 east,
Navajo county, Arizona, and to recover damages for
the use thereof. Defendants in their answer and cross-
complaint, admit being in possession of said prem-
ises, and say that they and the Aztec Land & Cattle
Company, on the eighteenth day of August, 1917,
entered into an oral contract, by which the said Aztec
Land & Cattle Company agreed to sell and they agreed
to purchase said lands, for the consideration of $12,-
962.25, to be paid in annual installments of $2,062.75
until the purchase price was paid; that thereafter, on
September 24, 1917, they made the first payment, which
was accepted by the Aztec Land & Cattle Company,
and that they were put into possession by the owner.
It is also alleged that plaintiff company drew a con-
tract of sale, and submitted the same to defendants,
who on their part executed it, but that plaintiff com-
pany has failed and refused to execute said contract,
or to carry out its agreement to convey said lands to
defendants. The cause was tried to the court without

a jury. Judgment was entered, restoring premises to plaintiffs, and for $500 for use and occupation. The defendants appeal.

The court made findings of fact, and it is contended that the evidence does not support them or the judgment, and error is assigned thereon.

During the trial, and when all the material evidence had been submitted, the learned trial judge suggested the points for decision in the following words:

"I do not take it that there is any controversy in this case, but what the defendants made an application to buy this land, and there is no controversy but that they made a deposit for that purpose. The only question is as to the authority of the persons they were dealing with, and the action they took with reference to the money that they put up. That is all that I can see here"

—to which counsel for plaintiffs made reply, "I agree fully that that is all there is." From our investigation of the record, we are convinced that the court rightly conceived the questions to be decided.

There is very little, if any, material conflict in the evidence. It is to the effect that all preliminary negotiations looking to a sale of the described lands by the plaintiff company to defendants were carried on by Captain Henry Warren, resident manager of the company, as its agent, and by defendants first and afterwards by W. H. Clark representing them. These negotiations were prior to August 18, 1917, and, so far as the record shows, were mostly carried on by word of mouth, and consisted in the details of location, price and terms of payment, as usually happens in such cases. However, on August 18, 1917, Captain Warren, who was temporarily sojourning in San Diego, California, wrote Clark the following letter:

"Inclosed please find contracts for R. L. Keith for land in township 14, range 19, which please have him sign and acknowledge before a notary public and return to me, together with check for first payment."

Captain Warren, having died  very  shortly  after
writing the above-quoted letter, Mr. Clark, as agent of
the defendants, after securing defendants' signatures
to the contract referred to in the Warren letter, on Sep-
tember 5, 1917, sent it together with defendants' check
covering first payment to E. J. Engel, president of
plaintiff company.   Under date of September 24, 1917,
Engel wrote Clark as follows:

"E. J. Engel, President,
"Aztec Land & Cattle Co., Ltd.,
"1015 Railway Exchange, Chicago, Ills.
"Chicago, September 24, 1917.

"Mr. W. H. Clark, Holbrook, Ariz.

"Dear Sir:   On my return from Arizona I find your
letter of September 5th, inclosing proposed contract
for sale to Messrs. Keith and Reed, together with
check in amount of $2,062.75, being first payment
thereon.

"Mr. R. C. Kaufman, cashier of the Arizona State
Bank of Winslow, Arizona, is looking after Aztec Land
& Cattle Company matters at this time, and probably
will within the next week or two be appointed resident
manager.

"From the records I have, it appears that section 19,
township 14 north, range 19 east, was deeded in 1911,
and will, therefore, have to be excluded from the sale
to Messrs. Keith and Reed.   For this reason, the con-
tract as submitted by you has been sent to Mr. Kauf-
man, from whom you will hear as soon as he is in
position to deal finally with you.   In the meantime
the check which you inclosed has been deposited in the
Arizona State Bank, and proper refund for the price
of section 19, which was erroneously included, will be
made to you in due course.

"Yours truly,
"E. J. ENGEL."

On October 4th, Engel's attention, in some way not
disclosed, having been called to the fact that plaintiff
Morse had a lease of the lands in question, wrote again
to Clark as follows:

"Referring to my letter of September 24th as to application of Messrs. Keith and Reed for certain Aztec Company lands: It now appears that George C. Morse has these lands under lease, has made extensive improvements thereon, and should be given an opportunity to buy them. Whether or not he made application to Captain Warren is not disclosed by such papers as we have been able to locate. Mr. Morse has no legal claim as to purchasing these lands, but, as you know, it has been our policy to permit lessees to make purchases if they care to do so. I have asked Mr. Kaufman to get in touch with you and explain the whole situation frankly and clearly. Because of the condition of Captain Warren's papers, it has not been possible so far, and will not be for at least two weeks more, to say anything definite to any one in connection with the applications which we have so far located. I shall, therefore, have to beg the indulgence of yourself and your clients until we can get things straightened out. Quite possibly if this particular land cannot be sold to Messrs. Keith and Reed there are other lands which will be equally satisfactory to them which they can purchase."

Kaufman, who had in the meantime been appointed resident agent or manager of plaintiff company as successor to Warren, thereafter made ineffectual attempts to return to defendants the $2,062.75 sent the plaintiff company as first payment; the defendants refusing to accept it. The check sent for first payment was a cashier's check on the First National Bank of Albuquerque, New Mexico, payable to the order of the Aztec Land & Cattle Company. It was indorsed by the payee as follows:

"Pay Arizona State Bank, Winslow, Ariz., for deposit account Aztec Land & Cattle Co."

Kaufman, according to his statement, placed the indorsement on the check, collected it from the drawer, and deposited the cash to the credit of plaintiff company in the Arizona State Bank, of which he was the cashier.

Speaking generally of first payments made by purchasers of land from the plaintiff company, Kaufman said they were deposited to the company's credit "to be held until the contract is either approved or rejected; if rejected, to be returned to the tenderer, or, if approved, to apply as their first payment on the land." He also said he placed this particular deposit in a special account on his books for the Aztec Land & Cattle Company, and that the bank was "responsible to the depositor of the check." At the institution of this suit, the money representing deposit for first payment was by the plaintiff company paid into the court.

There is no question about Engel's authority to bind his company in contracts of this kind. All applications to purchase lands were reported to Engel in Chicago as president of the company for the purpose of "having them approved and executed or rejected and returned," so Kaufman testified. He also, as a witness, said of Warren's authority:

"He was a sort of solicitor, and had authority to accept applications that were *bona fide* by the tender of an earnest payment of the amount that the proposed contract carried as first payment."

Kaufman's authority was like Warren's. The evidence as to how the defendant got into possession of the premises is as follows: Defendants testified that as soon as first payment was made they entered into possession, and fenced the premises at an expense of $1,500. Kaufman testified that he advised the defendants, after their application had been rejected, that "it would be necessary for them to vacate." It appears that he knew when defendants took possession, but it is not shown that he, or anyone else for the company, expressly authorized or protested the defendants' taking possession.

The court found: (1) That the contract set out in defendants' cross-complaint was within the statute of frauds, and void; (2) that Captain Warren had no power to make contracts of sale for plaintiff company; (3) that there was no money paid or accepted under said contract; (4) that there was no part performance of said alleged contract, or any performance that would take it out of the statute of frauds; . . . (6) that defendants' entry on the twenty-fourth day of September, 1917, was wrongful and unlawful; and (7) that the rental value of said premises from the twenty-fourth day of September to the time of trial and judgment was $500. These are the findings which defendants claim in their assignments of error are not supported by the evidence, and they especially challenge Nos. 3 and 4.

We have recited the evidence illustrating the authority and power of the resident managers Warren and Kaufman, and we think it deducible therefrom that their agency was limited to soliciting purchases, receiving applications and first payments, to be forwarded to Engel, the president of the plaintiff company, at its general office in Chicago for approval or rejection. The power to close deals and make binding contracts of sale was vested in Engel, the president. The preliminary negotiations and the disposition of the first payment by the resident managers are largely immaterial, except in so far as they may shed light upon or explain the written document constituting the evidence of the final transaction.

As to whether the court's findings 3 and 4 are sustained by the evidence or not, we think depends upon the construction to be given Engel's letter to Clark dated September 24th, viewed in connection with all the surrounding circumstances. In that letter he acknowledges the receipt of defendants' offer to buy the lands in question, together with check covering the first payment thereon. Remembering that the resident

manager, Warren, was no longer, living, he suggested that Kaufman would receive the appointment "within the next week or two"; that section 19 would have "to be excluded from sale to Messrs. Keith and Reed," and "for this reason the contract as submitted . . . has been sent to Mr. Kaufman, from whom you will hear as soon as he is in a position to deal finally with you"—that is, we conclude, as soon as he is appointed resident manager and has the power to act—and he says proper refund will be made in due course for section 19, which was erroneously included, and the balance of the check for first payment will be retained. This, of course, is not his wording, but undoubtedly his meaning. That the check was to be converted into cash, and the latter, and not the check, deposited with the Arizona State Bank, is also evident from his proposition to refund to Keith and Reed some portion thereof. The only reason for returning contract unexecuted was because it erroneously included section 19, which had theretofore been deeded. The offer to purchase those lands to which the company had title was unconditionally accepted, and of the first payment it was proposed to refund only the price of section 19, to which it had no title and could not sell. The reason for desiring not to consummate the deal with Keith and Reed is quite plainly set out in Engel's letter of October 4th, as being a policy of the company to permit its lessees to purchase if they so desire, and, since Morse had a lease on the lands and had made extensive improvements thereon, although he had no legal claim to purchase, it was thought he should be given that opportunity if he were so disposed. The evidence shows that Morse had made no improvements on the lands, and had none thereon, and that Keith and Reed knew nothing of his lease, either actually or constructively, until they had taken possession of the land believing that their application to purchase had been accepted. It seems quite clear, therefore, that if

Morse had any equities or rights, they lay between the company and himself, and not the defendants. We are unable to see how the manner in which Kaufman, as cashier of the Arizona State Bank and resident manager of the plaintiff company, carried the deposit of the first payment on his books could affect the transaction. The money was placed in the bank as the money of the Aztec Land & Cattle Company. It had not been accepted conditionally, and, according to the indorsement thereon and Engel's letter of September 24th, was deposited in the bank as the money of the plaintiff company. The plaintiff company, having promised to refund the price of section 19, became the debtor of Keith & Reed to that amount. It became the absolute owner of the balance of the first payment. No manipulation of this first payment by Kaufman could affect or change the character of the transaction as made by Engel, who had approved the sale before the check for first payment reached Kaufman. The inevitable conclusion is that defendants did make their first payment, and that it was accepted by plaintiff company, and to that extent the contract was partly performed. Findings Nos. 3 and 4 are therefore not sustained by the evidence.

Neither does the evidence sustain finding No. 6. It is true the evidence fails affirmatively to show defendants were put into possession of the land by plaintiff company. Defendants say they took possession after making first payment, and it appears that plaintiff company knew this, and did not object until it was ascertained the matter could not be amicably settled by defendants' accepting a return of the first payment and calling the deal off. It was then that they were notified to vacate. In such circumstances, when it is considered that these lands were grazing lands and defendants stock-growers, it would, we think, be a violent presumption that their entrance thereon and inclosing it with a fence were not with the full consent

and acquiescence of the plaintiff company, and this conclusion is confirmed by the absence of any protest or objection until after it was ascertained that their differences could not be amicably settled, when they were, for the first time, notified to vacate the premises.

One other point remains, and that is as to whether the elimination of section 19 from defendants' offer to purchase, the defendants not by letter or word of mouth having notified the plaintiff company that they would proceed with the contract notwithstanding, was tantamount to a rejection thereof. In this connection, it should be remembered that in Engel's letter of September 24th it was apparently assumed without question that the elimination of section 19 would be satisfactory to defendants; that the details of making the necessary and suggested change would be left to Kaufman, who was on the ground, and that a refund from the first payment would be made the defendants. We think the reasonable and fair deduction to be drawn from defendants' conduct in taking possession and going ahead to fence the land at an expense of $1,500, and refusing to accept a return of first payment, notwithstanding the elimination of section 19, is that they were satisfied with the arrangements suggested by Engel in his letter, and by their conduct or silence bound themselves to perform the contract as modified; and, if they were bound, the proposition being that of the plaintiff company, it too became bound.

In 13 C. J. 283, section 87, the proposition is stated as follows:

"Where one makes an offer with certain terms or conditions, and accepts an acceptance which is not responsive to the proposal, he is bound by the contract thus made, and cannot fall back on his proposal in case of subsequent disagreement. This acceptance has made a new agreement on the terms of the new offer. The acceptance of the modified proposal must be in accordance with its terms, although the offerer need not make a formal acceptance of the new proposal by

the offeree, but such acceptance may be inferred where the parties enter on the execution of the contract as if the new term was included.''

The evidence shows that plaintiff Morse's claims on the lands in question are subordinate to defendants.' It is true he had a lease on them antedating defendants' contract of purchase, but it was not recorded until some time after the date of defendants' contract. The defendants, therefore, had no constructive notice of Morse's lease, and as to them it was void. Paragraph 2066–2080, Civ. Code 1913. They obtained actual notice of his lease some time after the date of their contract, and after they had taken possession. Morse had no improvements on the land, and was not on it or using it when defendants examined it in July, or at the time they took possession. Morse's contract of purchase is dated March 1, 1918, five months after the date of defendants' contract, and was entered into with full knowledge of defendants' equities.

We have been considerably annoyed and hindered in trying to do what seems to us just and right in this case because of the somewhat unintelligible and duplicitous character of the defense as set out in the pleadings of defendants. Whether they rely upon an oral or a written contract, or a contract partly oral and partly written, it is difficult to tell, as mention of both kinds is made. The allegations should have been more definite and certain, but they were not. The trial proceeded and evidence of the contract so indefinitely set forth was introduced both oral and documentary. We feel, therefore, that duty requires that we sustain the defendants' pleadings, if possible, and we do so on this line of reasoning. If Warren, who carried on the preliminary negotiations, had no authority to make binding contracts—and of this we are satisfied—then his oral contract, standing alone and unsupported, was a mere *nudum pactum*. However, Warren's oral con-

tract was, by Engel's letter of September 24th, as we conceive it, duly ratified and confirmed. The contract of purchase drafted and submitted by Warren to defendants for execution evidently was a correct memorial of all previous negotiations and agreements, oral and written, between him as agent of plaintiff company and the defendants, and, it being approved by Engel, was equivalent to a ratification and approval of the understandings and agreements of the parties leading up to its composition and execution by defendants. And the defendants, having made the first payment thereon, and having entered into possession and made valuable improvements, acquired equities taking the oral contract out of the statute of frauds. Construing the defendants' cross-complaint as alleging and relying upon an oral contract partly performed, it is supported by the evidence.

If the cross-complaint be construed as alleging and relying upon a written contract of sale, it is more abundantly supported by the evidence. We think Engel's letter of September 24th was more than a ratification of the oral contract. It was, in fact, a written acceptance of defendants' offer as contained in contract prepared by plaintiff company, modified by the elimination of section 19, which, as we have seen, was acquiesced in by defendants. If the single word "oral" be stricken or omitted, the pleading would state a cause of action or defense upon a written contract, and we think, in the interest of justice, that may be done.

Judgment is reversed and cause remanded, with directions that the plaintiffs' complaint be dismissed.

CUNNINGHAM, C. J., and BAKER, J., concur.